May it please the Court, good morning. My name is Stephen Montoya. I'm here on behalf of the appellant, Mr. James Eagle. I would like to reserve four minutes of my time for rebuttal. May it please watch the clock. Thank you. I think this was a case that was completely inappropriate for summary judgment. The factual disputes in this case were very poignant and in some respects overwhelming. We have a man born in 1944, well over 60, has worked for an automobile dealership in a managerial sales capacity for almost eight years. Everyone that he works with is substantially younger than him, including the owner, the de facto owner, Mr. Ryan Hancock, who's in his early 30s. We're aware of the factual background of this case, so maybe you could just turn to the question about what creates a genuine issue material fact that he was discharged under circumstances giving rise to an inference of age discrimination. He was discharged by Santa Maria, who had been there for a month. Younger people were also fired, and he had no evidence of statements actually made by Santa Maria except for some ambiguous thing about I don't know how you get up in the morning or along those lines. So help me understand what creates a genuine issue material fact under the specific facts here that the circumstances gave rise to an inference of age discrimination. I'll try. First very important fact is even though some young individuals were laid off with Mr. Eagle, he was the only one who was laid off in the sales force. And that's important, Judge Acuda, because in the sales force, he was also the highest producer among all of his peers. But there was evidence that he was managerial and that the person most similarly situated was Mr. Snow, who was 33 and was also fired. Well, let me address that. They had very different positions. In fact, after Mr. Santa Maria came on board at the dealership, there was really no question that Mr. Snow was going to be terminated because they didn't need two general managers of the dealership. There was the owner, Ryan Hancock. He couldn't run the dealership by himself because Toyota wouldn't let him. Toyota didn't think it was qualified. The general manager of the dealership was another young guy. He was Mr. Hancock's best friend, according to the record, and that was Mr. Snow. Because Mr. Santa Maria had been brought in to run the dealership, Mr. Hancock couldn't do it. There really wasn't anything for Mr. Snow to do. But focus back on Judge Acuda's question. Yes. He was fired by Mr. Santa Maria. Yes. Tell me what evidence there is that Mr. Santa Maria did it because of his age. I know he was the oldest guy. But all I can find in this record that even comes close to Mr. Santa Maria having an age-related reason is the statement where somebody comes in late to work and says, sorry, I slept too late, and Mr. Eagle says something, and in response, Mr. Santa Maria says, I'm surprised you can get out of bed in the morning. Assume that's supportive of your case. What else is there with respect to Mr. Santa Maria that suggests that he has an ageist agenda? Something very specific, something very substantial, and it's all set forth on page 143 of the excerpts of record. Let me read a little bit right now. That's where they're talking about comments he might have overheard. Is that what you're saying? Yes. When I actually looked at the comments he overheard, the only one that they could say, that he could say, Mr. Eagle could say specifically that he knew Mr. Santa Maria had overheard was, we got Eagle, he's the only guy, which, again, is very ambiguous. That's, with all due respect, Judge Acuda, that's not correct.  I will. It's volume 2 of the excerpts of record on page 143. The transcript page is 171, lines 4 through 8, which read, quote, bracket, discriminatory comments, close bracket, we're going on all of the time. Well, we're reading it here. You're not alleging that Bob Santa Maria ever made any age-related comments, are you? I'm not alleging that. He knew about them. That's what's on page 170. So tell me what age-related comments he knew about. I'll tell you. This is throughout the day. Bob Santa Maria would walk by and someone else would say. He said could walk by. If I'm reading this correctly, it says he could walk by. Yes. I mean, this is all he's saying. This could have happened. But when they're trying to get down to something, what do you actually remember, then we're on page 172, where he keeps pressing. Can you tell me what one time you remember a statement being made in his presence? And that's when the only statement he can remember is, we got Eagle, he's the only guy. That's true, Your Honor. But if I can. He did remember this. Old man, what's the matter with you? No, he remembers other people said those things. The question is whether Mr. Santa Maria heard those things. Well, I think if you construe, as you must in this procedural context, the one of motion for summary judgment, if you construe the facts and the inferences in the nonmoving parties' favor, then Mr. — then clearly Mr. Eagle testified that Mr. Santa Maria heard those things and he either. No, no, he didn't. He didn't. What he said was he might have heard those things. He could have heard those things. They were said when he was in earshot, things that were close by. But he never says, and I'm trying to — his testimony is, A, Santa Maria himself never made any ageist comments. That's what he says. Number two, there were comments made by other people, but when he gets pressed on whether or not Santa Maria actually heard any of those, all he says is the one that Judge Acuda identifies, unless I'm misreading the records. I need your help on that. Well, I think that is not a fair reading of the record. Tell me where he says something different. I'm trying to. I'll tell you. Quote, you're not alleging that Bob Santa Maria ever made any age-related comments, are you? I'm not alleging that. Flat-out answer. He knew about them. Okay. And then we're reading the same pages in the transcript. And then they go on to say, so let's figure out which ones he knew about. And he's unable to identify any. Well, remember, when he's being deposed, it's almost four years after the fact. His deposition was on November 14th of 2012. He was terminated on March 9th, 2009. Almost four years have passed. And it's kind of like saying, Judge Acuda, did your law clerk wish you a good morning on Friday of last week? You'd probably say, well, she probably did. She's pretty perky. She's probably pretty polite. I'm pretty sure she wished me a good morning. Maybe you couldn't remember the specifics, Judge Acuda, because it happens so routinely. However, I think that you could still testify with certitude that if, in fact, your law clerk did see you that morning, she would have greeted you good morning. It's hard to remember specifics when something is happening constantly, which is the testimony. We're dealing with a summary judgment. Correct. Where it's your obligation to establish a material fact. We've got Mr. Eagle's deposition and we have his declaration. And so is there any other place in the record, whatever they say, where I can find corroboration that Mr. Santa Maria either heard or approved of ageist remarks? Without regard to what they say, because I'll go back and read them, are those the only two places that I can look to find it? Yes, Your Honor. He was the only witness. Mr. Eagle was the only witness to testify that Mr. Santa Maria heard those remarks and laughed at them. And even though they weren't specific, he was very specific in saying that it happened four or five times and that he was sure that either Santa Maria heard them or, worse, he laughed at them. Okay. So your case — and because Mr. Eagle says Mr. Santa Maria himself never made any ageist remarks, then your case turns on whether or not his hearing and either laughing or not rebutting them establishes the motive, right? Yes, but we're not alone in that conclusion because in Judge Reinhart's opinion, in the case of Ching v. University of California, as Your Honors are aware, and that's reported at 225 Fed 3rd, 115. The specific site is at 128. Judge Reinhart considered a faculty member was being — or an Asian faculty member sued the University of California. The faculty committee that allegedly denied the Asian faculty member a promotion, in another meeting involving another employee of Asian descent, made — one individual made two racial comments. He called the professor a chink twice. We already have two chinks in the department. And the other guy laughed. And Judge Reinhart wrote in the chain case, for purposes of summary judgment, Dean Williams' laughing response to this remark establishes adequate evidence of discriminatory intent on his part also. But the only laugh I have here is someone — something was said. We got Eagle. He's the only guy. Santa Maria looked at me and laughed. But we got Eagle. He's the only guy is not an ageist remark. No, but — I don't know what sort of remark it is. Other cases have said that when you have a pattern of discriminatory remarks by senior management, those can consider, too — But here we don't — — can be considered, too. We don't have the pattern of discriminatory — we have a pattern of remarks by workers. And you're attributing them to management because you heard them were in disapproval, right? So new management — Not only by workers, Judge Hurwitz, but also by the owner. But he was gone. So the decision-maker here, Santa Maria, came in, and he is the one who made the decision about who to fire. The owner wasn't gone, Your Honor. He wasn't gone. There's a factual dispute regarding that. Even though some of his management duties had been taken away, once again, Mr. Eagle testified that, hey, Ryan Hancock was still in the store. He was still telling everyone what to do, including me. So there's a factual dispute regarding — Was there any evidence that Mr. Hancock played a role in the firing of Mr. Eagle? Well — I mean, Mr. Eagle said he was around, and I'm sure he must have. But is there any specific evidence that he played a role in the firing of Mr. Eagle? No, except the fact that he owned the place, and he announced that he — just four months before Mr. Eagle was terminated, the owner of the place publicly announced that he wanted all young guys in his team. And in the same context, Mr. Eagle was being called every name in the book. And, moreover — and this goes to pretext, too, Your Honors — the only thing that Mr. Santa Maria told Mr. Eagle during this whole period of time was, you're doing a good job. Keep it up. You're doing what you're doing. So the one time that Mr. Santa Maria had an opportunity to criticize Mr. Eagle's work performance, he did not. Moreover, when Mr. Santa Maria got his first opportunity to explain why he chose Mr. Eagle for termination, who had an unblemished disciplinary record, who had never been criticized by anyone, including Mr. Santa Maria, he didn't say what he told this man, our CSIs are low, this guy's too high pressure. He testified, I eliminated his position, which, in fact, was not true. You want to save the remainder? I would like to. Thank you, Your Honor. Mm-hmm. That time goes by very quickly. At the podium and elsewhere. Thank you. Thank you. Thank you and good morning. Jeffrey Miller, Lewis, Brisbois, Biscard, and Smith on behalf of defendant and appellee Bill Alexander, Automotive Center, Incorporated. Based on the comments here this morning, I think I would like to focus predominantly on the pretext issue. And could you tell us why was Mr. Santa Maria fired? Why was Mr. Eagle fired by Mr. Santa Maria? What was the reason? Yeah. I guess this goes to prong two, Your Honor. Well, there's a record. Tell me what I was looking through this record trying to find the reason. Yes. Tell me what the record tells me the reason for the firing was. There were actually two reasons. The first reason was the lack of expectation of what was expected on the job itself, because the real problem and the real reason Mr. Santa Maria came onto the situation was because of problems with the servicing. We call those the CSI scores. This was a critical problem because this is a Toyota franchise. And with a Toyota franchise, they have control over that franchise. And this was a facility that was in serious trouble because for the past four straight years, they were in the 10% or below in the very bottom rung of CSI scores that are very important because Toyota needs to know that the customers enjoy the buying experience. If they don't, that affects Toyota. Okay. So you're right. We're at prong two. Right. He's over the age. You have a – you proffer a non-racially – non-racially, not age-related reason because I think – Precisely. And now he comes back and says it's just a pretext. So can you tell me what the evidence shows in this case about similarly situated people with the same sort of CSI scores? Does it show anything? In other words, you say you fired him because CSI scores were low. Yes. That's one of the reasons. That's for the whole dealership, right? Right. Right. Are they individually? Can you tell how they come – can you tell in this record who they come from? The CSI scores? Yeah. Yeah. They're part of the Toyota process, Your Honor. They're run by corporate – Are they attributable to individual salespeople or just to the dealership? They're attributable to the facility themselves. Okay. So what happened was when Mr. Alexander died, that was the time that Toyota could bring someone in and find out what was happening with this situation. So what I'm having difficulty figuring out is why – why CSI scores relate specifically to Mr. Eagle as opposed to – Right. Equally to others. Fair question, Your Honor, because when Mr. Santa Maria came in – again, this is a guy from the outside coming in in January of 2009. The first thing he did was to take a look at what was going on in this facility. And it became very clear very quickly that there were really two individuals that were running the show, you might say. And in this particular case, they had kind of an old-school attitude of unit sales, get the sales, very aggressive sale tactics. And his theory was obviously that was affecting the consumer satisfaction on this side. So what he did was look at the conduct of Mr. Snow, who was the general sales manager, who I think the elephant in the room here, he was 33 years old. And then looking at what was happening with the plaintiff, Mr. Eagle. In the hierarchy of the dealership, where did Mr. Snow stand in relation to Mr. Eagle? Mr. Snow was ahead of him. Mr. Snow was the actual general sales manager on the sales side. Right. So he was the boss and Mr. Eagle worked for him. That's correct. And Mr. Eagle, though, was, had a lot of experience and ended up being a de facto manager with Mr. Snow because he would run meetings. He was in charge of many advertising and promotion details. So he was acting as a de facto manager. He looked at that conduct and realized that is the problem and that's when he decided to make the move to terminate plaintiff. And the interesting thing that the record is unequivocal about is when that happened, things did change with those CSI scores. Within that same year, this firing occurred in March of 2009. I'm not sure how the subsequent. At the end of the year. I'm not sure how the subsequent evidence deals with the age-related stuff. You may have, if you fired somebody because of his age and it turned out you got better employees. I guess I'm saying that I think they were right in their legitimate reason. Okay, but let's go. There was evidence that age discriminatory remarks were pervasive at that facility and that evidence is unrebutted. And then Santa Maria comes in and Mr. Eagle says, well, by necessity, he would have had to hear that as he's walking around the plant. Why doesn't that create a genuine issue material fact? Because the key, Your Honor, and I think you mentioned it in your questioning, was the real key is who is the decision-maker in the termination. So let's assume Mr. Santa Maria is the decision-maker. That's correct. He hears these remarks, at least some of them. Mr. Eagle can't remember all of them years later. But he does say he heard ageist remarks and laughed at them. And he did say at one point, I'm surprised you can get out of bed in the morning. There may be explanations for those, but we're not at the explanation stage of the case. We're just at the facial stage of the case. Right. Why isn't that facially enough to get past the burden after Step 2? Let's take each individual comment that you just made there. The only evidence in the record of any specific statement was exactly that. Quote, I'm surprised you can make it out of bed. That's just not ageist, especially in light of this record that it's very clear that, albeit, a plaintiff did work very long hours, 12-hour days many times. So that's just not a statement that has any real inference of any ageism. What was the context of that statement? I'm trying to recall. What happened was somebody showed up late to work and said, I overslept or something like that? They were in a meeting and it was relating to something like that. But it certainly wasn't in the context of anything having to do with age-related. Well, and then Mr. Eagle said something like, I got here on time, you should be able to, too, right? That's correct, Your Honor. That's correct. Okay. So that just doesn't rise to the level to create a genuine issue of fact. And the laughing issue, again, I think Judge Acuto said, you know, when you delve into that deposition, it's extremely vague to say that that would amount to anything specific and substantial. I don't think it's a close call. The only – when you get down to what did he overhear, it's, quote, we've got Eagle, he's the only guy. What does that mean? It's hard to say what the context of that was, Your Honor. I can't speak for that other than to say that it doesn't definitively say anything ageist. The particular case that counsel relies upon in the laughing case was the Chung case. And we don't have anything close to that. I mean, that statement was real and it was something to the effect that we don't need another change here. And it was made by a committee who were the decision makers. And that statement was made and they laughed right at that. What do we have here? We have something that doesn't even sound ageist and it was maybe a sticker on something that simply just doesn't equate to that kind of level. I think that's the real key here is that when we're talking about, you know, specific substantial evidence here, there are certain things that aren't going to qualify and we have it all over here. You know, you can't base it on speculation and general conclusionary items saying, well, you know, I think there were bad comments. Well, you've got to put your money where your mouth is. And if you'd spend any time reading this deposition, it became very clear it was like pulling teeth to get any details in this particular case. And at this point where the burden shifted because we did have a showing of legitimate a prong to, a legitimate reason for the termination, the adverse action, now it was incumbent upon a plaintiff to present real and substantial evidence. I think Judge Malloy has a question for us. I was just going to ask, going back to the CSI scores for a minute, as I understand there is some level of specificity within the score in terms of, you know, I may go to a Toyota dealership and have a very pleasant buying experience, but the service department is lousy, or conversely, the buying experience wasn't great, but I get great service. As I understand it, everything was bad at this dealership, right? Yes. In fact, both the sales side and the service side had bad CSI scores. So was there anything comparable done on the service side? Yes. Yes. In fact, you should say that there were terminations done on the service side for this very reason by Mr. Santa Maria. We had Mr. Rivera, the parking manager, was terminated. Well, give me their age so I can tell. Mr. Ramuto and Mr. Garcia, all of them were under the age of 30, all of them. So to say that that is in any way indicative of age discrimination I think is a far fetch. Mr. Montoya says you may have fired other people, but you didn't fire other people in comparable positions who were over 40. What does the record disclose on that? The record shows the most comparable position was Mr. Snow. Mr. Snow was that other person working in tandem running that particular business. Was anybody else over 40 terminated in this purge, if you will? No. And it was, in fact, nobody else in this scenario that was involved. So are we to take into account as we look at this other firings that occurred at the same time or roughly at the same time? Well, I think the most important thing to look at here from the standpoint of was there, in fact, but for cause age discrimination, and I do call it the elephant in the room because the first time I looked at the record, it shocked me, and that was that on the very same day, Mr. Snow, who was 33, was fired with the person who was over 60, and they were fired on the identical day to say that that's somehow evidence. And I guess I asked my question poorly. You say there's a bunch of firings, and I assume they're in the record, but are they – do you view them as one package or do you view them as several different packages? I view them as part of – I will view Mr. Snow and Plaintiff as a package. Right. That one I understand. They're just very temporarily related. As I recall, Your Honor, make sure I get some dates here. I think several of them – Mr. Rivera, the parts manager on the service side, was fired in February of 2009, which was just a tad before, and then Mr. Ramundo, Mr. Garcia, Mr. Ramundo was April of 2009, Mr. Garcia October of 2009. I think it was part of the process when Mr. Santa Maria came in. Again, he was learning the ropes of that particular facility. As he saw things, then he made moves, and the move he made here was on the sales side looking at how this particular dealership was run. Mr. Snow and Mr. Eagle working in tandem were, in his view, the cause of the problem associated with the CSI scores. If there are no further questions, I would submit. Thank you. Thank you. Things did pick up after Mr. Santa Maria took charge, but what the district court did with that was really the opposite of what this court's rules provide. In fact, the district court once again construed the facts against Mr. Eagle. After Mr. Eagle was gone, when the dealership picked up, instead of concluding that it was because Mr. Hancock was gone, the district court concluded that it was because Mr. Eagle was gone. Isn't it irrelevant in either respect? Once he's gone, it really doesn't matter. If he was fired for an age-related reason, it doesn't matter how well they did afterwards. And if he wasn't fired for an age-related reason, it doesn't. So I'm not sure why the subsequent events have any effect on this case at all. I don't think it has any. I don't think it's important, except it does show that the district court was engaged in a pattern of construing the facts and inferences against my guy. I will leave you with this. When have you ever considered a case in the car dealership context when the most profitable employee who has no record of discipline, no record of treating customers poorly, is terminated, when his younger, substantially younger, 10 years, 20 years younger, his peers remain? That is really weird. And that, when considered in the totality of circumstances, Ryan Hancock calling him a dinosaur and an old F-U-C-K, Mr. Santa Maria laughing when he hears age-biased comments or not doing anything about them, when you consider the facts in their totality, summary judgment was inappropriate. If the Court doesn't have any questions, I'll thank the Court and sit down. Thank you. Thank you, Judge Okuda. Thank you. Okay. The case of Eagle v. Bill Alex, the Enter Automotive Center, is submitted, and the Court for this session stands adjourned.
judges: Ikuta, Hurwitz, Melloy